UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

SEAN BROOKS SKIRLAW,

    Plaintiff,

v.

JOHN FORRESTER,

    Defendant.

Case No. C08-5398RJB-KLS

REPORT AND RECOMMENDATION

Noted for July 10, 2009

This matter has been referred to the undersigned Magistrate Judge pursuant to Title 28 U.S.C. §§ 636(b)(1)(A) and 636(b)(1)(B) and Local Rules MJR 1, MJR 3, and MJR 4. This matter comes before the court on defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56. (Dkt. #31). Having reviewed defendant's motion, plaintiff's response thereto[1] and the remaining record, the undersigned submits the following report and recommendation for the Court's review.

## FACTUAL AND PROCEDURAL BACKGROUND

This case involves a civil rights action under 42 U.S.C. § 1983 filed by plaintiff against defendant.

---

[1] Plaintiff's response to defendant's motion for summary judgment, to the extent it can be considered one, consists solely of a motion for voluntary dismissal of this case pursuant to Fed. Civ. P. 41(a)(2) (see Dkt. #32), which does not address the merits of defendant's motion, and which the undersigned has denied in a separate order dated the same date herewith.

REPORT AND RECOMMENDATION
Page - 1

Plaintiff filed his original complaint with the Court on June 23, 2008. (Dkt. #1-#6). On October 15, 2008, plaintiff filed a proposed amended complaint (Dkt. #19), which the undersigned accepted for filing on November 3, 2008 (Dkt. #22-#23). In his amended complaint, plaintiff alleges defendant violated his constitutional rights – specifically, his First Amendment rights to freedom of speech and freedom of religion and his Eighth Amendment right to be free from cruel and unusual punishment – based on the following factual claims:

> 6) On March 05, 2008 at approximately 1403-04 hours, Defendant FORRESTER entered the SCCC [Stafford Creek Corrections Center] H-1 Unit Resource Room while Plaintiff was employing the use of the WDOC [Washington State Department of Corrections] Kiosk.[2]
> 7) During this time, Defendant FORRESTER physically pushed Plaintiff with his left arm. Plaintiff informed Defendant FORRESTER that this action was contrary to Plaintiff's religious mandates.
> 8) Defendant FORRESTER then pushed Plaintiff once again. Plaintiff again gave notice to Defendant FORRESTER that his rights were being violated. Plaintiff attempted to explain the situation, yet was only threatened with increased punishment and segregation by Defendant FORRESTER.
> 9) A witness to the entire acts [sic] described herein was Michael Maddy, who was working as the Resource Room Clerk on March 05, 2008. Mr. Maddy has personal knowledge of the subject matter of this litigation (See Attachment A).[3]

(Dkt. #23, p. 2). Plaintiff also sets forth additional state constitutional and state tort claims arising from the same factual claim. (Id. at pp. 2-3). He seeks injunctive and declaratory relief and both compensatory and punitive damages. (Id. at p. 3).

According to defendant, "[h]ousing at SCCC is designated by units which are individual living pods," one of which is the "H-1"[4] unit that housed plaintiff. (Dkt. #31-3, Exhibit 2, Declaration of John Forrester, p. 1). The "Resource Room" located in the H-1 unit "serves all offenders" in that unit, and, as noted above, contains the KIOSK. (Id. at pp. 1-2). In terms of inmate access to and use of the Resource Room and KIOSK:

> . . . The Resource Room is usually manned by an inmate porter, whose job is to monitor the room. the door to the Resource Room is locked. DOC staff can enter the room

---

[2]A "KIOSK" or "KIOS" is a "computer terminal available for offender use," with which they can "access certain limited, personal information such as his inmate account or his classification level," or to "email his counselor." (Dkt. #31-3, Exhibit 2, Declaration of John Forrester, p. 2). For the sake of clarity and consistency, the undersigned shall use the term "KIOSK" when referring to this device.

[3]No "Attachment A" was attached to the copy of the amended complaint plaintiff filed with the Court.

[4]Defendant refers to this unit as the "H1" unit. See (Dkt. #31-3, Exhibit 2, Declaration of John Forrester, p. 1). Again, for the sake of clarity and consistency, the undersigned shall use the "H-1" designation employed by plaintiff.

with a key, but an offender must request entry to the Resource Room from the porter, or otherwise walk in the room when the door is already open while another person is going in or out. An offender can use the KIOSK to access certain limited, personal information such as his inmate account or his classification level, and he can also use the KIOSK to email his counselor. The KIOSK is not available for offender use on a twenty four hour basis. There are limited hours of operation for KIOSK use and those hours are posted on the Resource Room door. Whenever an offender is in the Resource [R]oom, the inmate porter is also required to be in the room as well. The KIOSK has a sign that is taped to the machine so it can be flipped down when it is not in use (e.g. "secured"), and flipped up when it is in use.

(Id. at p. 2). According to defendant, the events in question in this matter occurred as follows:

      4.     On March 5, 2008, the inmate porter assigned to monitor the H[-]1 Resource [R]oom was Offender Mike Maddy. At 2:00 pm, I entered the Resource Room and turned the KIOS[K] off, and flipped the sign down to indicate that it was "secured." At that time, there were no other offenders in the Resource Room, except for inmate porter Maddy. I then left the room.

      5.     Four minutes later, at 2:04 pm, I saw Offender Sean Skirlaw in the Resource Room, using the KIOS[K] after the scheduled time for use. I went into the Resource Room and directed Offender Skirlaw to leave. He ignored my directive and continued using the machine.

      6.     I told him a second time to disperse, at which point Offender Skirlaw became argumentative, saying "I don't need any of your Gestapo tactics," but nevertheless continued using the machine.

      7.     At that point, I stepped to the right of Offender Skirlaw and turned off the [KIOSK]. Offender Skirlaw continued being argumentative, using some course [sic] words. I told him that I didn't want to be sworn at, because I don't use that kind of language toward him. I also warned Offender Skirlaw that it [sic] he did not disperse, that I was going to send him to "the hole." In prison slang, "the hole" refers to a segregation unit.

      8.     At that point, Offender Skirlaw then left the Resource Room and went back to his cell.

      9.     At no time during this incident did I ever come into physical contact with Offender Skirlaw.

      10.     In my job as a Corrections Officer, I do not use profane language toward an offender, and I do not purposely come into physical contact with an inmate, unless it is necessary to do so for security reasons, such as pat searches, escorts or placing restraints on inmates. The May 5, 2008 incident with Offender Skirlaw did not require that I physically contact him.

(Id. at pp. 2-3).

Plaintiff did submit a written grievance to the prison grievance coordinator, in which he claimed that defendant "pushed him in a physical manner," thereby assaulting him, and that he also used profane language. (Dkt. #31-4, Exhibit 3, Attachment A). Mr. Maddy, the inmate porter, upon being questioned about the incident by prison officials, initially claimed defendant approached plaintiff "in an aggressive manner," and "brushed" him "aside with his arm." (Id., Attachments C and E). Mr. Maddy, though, later

retracted that claim, stating instead that while defendant "did use his arm to move" plaintiff "away from" the KIOSK, and approached him "in an aggressive manner," he did not aggressively "push" him. (Id., Attachments C and F). Ultimately, an investigation of the grievance conducted by prison officials found that while defendant "may have established contact with" plaintiff, there was insufficient evidence to support the allegation that the "verbal confrontation" he and defendant had "became physical," resulting in plaintiff actually being assaulted. (Id., Attachments B, C and H).

On May 18, 2009, defendant filed his motion for summary judgment, arguing plaintiff's amended complaint should be dismissed, because it fails to state valid First and Eighth Amendment claims, because this Court should refrain from assuming supplemental jurisdiction over the state law claims contained in the amended complaint, and because he is entitled to qualified immunity. As noted above, plaintiff has not filed a response to defendant's summary judgment motion challenging it on the merits. Also as noted above, while plaintiff did file a motion for voluntary dismissal of this matter, the undersigned has denied that motion. Accordingly, defendant's motion is now ripe for consideration, and, for the reasons set forth below, the undersigned recommends that it be granted.

## DISCUSSION

I.  Standard of Review

Summary judgment shall be rendered if the pleadings, exhibits, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56(c). In deciding whether summary judgment should be granted, the Court "must view the evidence in the light most favorable to the nonmoving party," and draw all inferences "in the light most favorable" to that party. T.W. Electrical Serv., Inc. v. Pacific Electrical Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987). When a summary judgment motion is supported as provided in Fed. R. Civ. P. 56, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in Fed. R. Civ. P. 56, must set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e)(2).

If the nonmoving party does not so respond, summary judgment, if appropriate, shall be rendered against that party. Id. The moving party must demonstrate the absence of a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). Mere disagreement or the bald assertion that

a genuine issue of material fact exists does not preclude summary judgment. California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987). A "material" fact is one which is "relevant to an element of a claim or defense and whose existence might affect the outcome of the suit," and the materiality of which is "determined by the substantive law governing the claim." T.W. Electrical Serv., 809 F.2d at 630.

Mere "[d]isputes over irrelevant or unnecessary facts," therefore, "will not preclude a grant of summary judgment." Id. Rather, the nonmoving party "must produce at least some 'significant probative evidence tending to support the complaint.'" Id. (quoting Anderson, 477 U.S. at 290); see also California Architectural Building Products, Inc., 818 F.2d at 1468 ("No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment."). In other words, the purpose of summary judgment "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." Lujan v. National Wildlife Federation, 497 U.S. 871, 888 (1990).

II. Claims Under 42 U.S.C. § 1983

To state a claim under 42 U.S.C. § 1983, a complaint must allege: (i) the conduct complained of was committed by a person acting under color of state law, and (ii) the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the United States. Parratt v. Taylor, 451 U.S. 527, 535 (1981), overruled on other grounds, Daniels v. Williams, 474 U.S. 327 (1986). Section 1983 is the appropriate avenue to remedy an alleged wrong only if both of these elements are present. Haygood v. Younger, 769 F.2d 1350, 1354 (9th Cir. 1985). A party has acted under color of state law if that party "exercise[s] power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" Johnson v. Knowles, 113 F.3d 1114, 1117 (9th Cir. 1997) (citations omitted).

Plaintiff also must allege facts showing how individually named defendants caused or personally participated in causing the harm alleged in the complaint. Arnold v. IBM, 637 F.2d 1350, 1355 (9th Cir. 1981). A person will be held to deprive another "of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that *causes* the deprivation of which [the plaintiff complains]." Leer v.

1 Murphy, 844 F.2d 628, 633 (9th Cir. 1988) (emphasis in original) (citation omitted).  The Court's inquiry

2 "must be individualized and focus on the duties and responsibilities of each individual defendant whose

3 acts or omissions are alleged to have caused a constitutional deprivation." Id.

4 III.    Plaintiff's First Amendment Freedom of Speech Claim

5 "[A] prison inmate retains those First Amendment rights" – including free speech – "that are not

6 inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections

7 system." Pell v. Procunier, 417 U.S. 817, 822 (1974); see also Jones v. North Carolina Prisoners' Labor

8 Union, Inc., 433 U.S. 119, 129 (1977).  Accordingly, "challenges to prison restrictions that are asserted to

9 inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the

10 corrections system." Pell, 417 U.S. at 822.  Thus, when a prison restriction impinges on an inmate's

11 constitutional rights, that restriction will be found to be valid if it is "reasonably related to legitimate

12 penological interests." Turner v. Safley, 482 U.S. 78,  89 (1987).

13 To determine the reasonableness of the prison restriction at issue, there are several factors that are

14 relevant to consider. Id.  "First, there must be a 'valid, rational connection'" between the restriction and

15 "the legitimate governmental interest put forward to justify it.'" Id. (citation omitted).  Under this factor,

16 the restriction "cannot be sustained where the logical connection" between it and "the asserted goal is so

17 remote as to render the policy arbitrary or irrational." Id. at 89-90.  The governmental objective or interest

18 also "must be a legitimate and neutral one." Id. at 90.  That is, the particular restriction must operate "in a

19 neutral fashion, without regard to the content of the expression." Id.

20 The second factor "is whether there are alternate means of exercising the right that remain open to

21 prison inmates." Id.  Thus, "[w]here 'other avenues' remain available for the exercise of the asserted

22 right, . . . courts should be particularly conscious of the 'measure of judicial deference owed to

23 corrections officials . . . in gauging the validity" of the action. Id. (citations omitted).  The third factor "is

24 the impact accommodation of the asserted constitutional right will have on guards and other inmates, and

25 on the allocation of prison resources generally." Id.  In other words, "[w]hen accommodation of an

26 asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be

27 particularly deferential to the informed discretion of corrections officials." Id.

28 Lastly, "the absence of ready alternatives is evidence of the reasonableness of a prison"

restriction. Id. On the other hand, "the existence of obvious easy alternatives may be evidence that the" restriction "is not reasonable, but is an 'exaggerated response' to prison concerns." Id. Prison officials, however, need not "set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint" to satisfy this factor. Id. at 90-91. In other words, it "is not a 'least restrictive alternative' test." Id. Nevertheless, if a prisoner "can point to an alternative that fully accommodates" his or her "rights at *de minimis* cost to valid penological interests, a court may consider that as evidence" that the governmental action "does not satisfy the reasonable relationship standard." Id. at 91.

Plaintiff alleges in his amended complaint that "[d]efendant's actions" violated his free speech rights under the First Amendment. (Dkt. #23, p. 3). As noted by defendants, though, the factual basis for plaintiff's claim is unclear. That is, plaintiff does not state the alleged actions he believes impinged on his right to freedom of speech. The only statement of facts alleged in the amended complaint that deals at all with speech is plaintiff's claim that he "attempted to explain the situation, yet was only threatened with increased punishment and segregation by" defendant. (Id. at p. 2). However, plaintiff has failed to show that defendant's threat of segregation – to the extent it can be construed as impinging on his freedom of speech rights – was not reasonably related to legitimate penological interests.

It is undisputed that the hours during which inmates were allowed to use the KIOSK were limited, and that those hours were posted on the door of the Resource Room. According to defendant, he entered the Resource Room at 2:00 p.m. on March 5, 2008, at a time when plaintiff was not present in that room, and "secured" the KIOSK by flipping down a sign indicating it no longer was in use. Four minutes later, defendant witnessed plaintiff "using the KIOSK after the scheduled time for use." While plaintiff alleges in his amended complaint that he was using the KIOSK prior to this time, and before defendant stated he entered the Resource Room, he has not come forth with any specific facts, by affidavit or otherwise as he is required to under Fed. R. Civ. P. 56(e)(2), in response to defendants motion, but merely rests upon the allegations contained in his amended complaint. As such, no genuine issue of material fact is created by the contrary factual claims made therein.

Defendant then directed plaintiff to leave the Resource Room, and did so once more after plaintiff ignored his first directive and continued to use the KIOSK. Plaintiff became argumentative and continued

REPORT AND RECOMMENDATION
Page - 7

to use the KIOSK. When defendant moved to turn off the KIOSK, plaintiff continued to be argumentative and also swore at defendant. Defendant told plaintiff he did not want to be sworn at, and warned him that if he "did not disperse," he would be sent "to 'the hole.'" It was only at that point that plaintiff complied with defendant's directive and left the Resource Room.

The undersigned finds defendant's actions toward plaintiff to have been reasonable here. Plaintiff was operating the KIOSK at a time when that machine had been "secured" from inmate use. After he was directed by defendant to discontinue such use, he became argumentative, and continued to use the KIOSK in defiance of not one, but two directives, to desist. When defendant then turned off the KIOSK, plaintiff escalated his argumentativeness by swearing at him, and only obeyed defendant's directive to leave after being threatened with the possibility of being placed in segregation. As noted above, an inmate "retains those First Amendment rights that are not inconsistent with . . . the legitimate penological objectives of the corrections system." Pell, 417 U.S. at 822; Jones, 433 U.S. at 129. Such "[l]egitimate penological" objectives or interests "include 'security, order, and rehabilitation.'" Witherow v. Paff, 52 F.3d 264, 265 (9th Cir. 1995) (quoting Procunier v. Martinez, 416 U.S. 396, 413 (1974)).

In the declaration he submitted along with his motion for summary judgment, defendant states in relevant as follows:

> . . . [O]ne of the primary goals in operating correctional facilities is to maintain order and security within the facility. Therefore it is necessary for the safety and security of the penal institution that offenders obey direct orders from corrections staff to proceed to, or disperse from a particular area. DOC staff persons do not disrespect offenders by ignoring them or using foul language, and we do not allow offenders to disrespect us. If an offender is allowed to disobey a direct order or to disrespect correctional staff, it may create or escalate a volatile situation that could threaten the safety and security of stuff and other offenders.

(Dkt. #31-3, Exhibit 2, p. 3). There is nothing in the record before the Court to suggest defendant acted in any way other than in accordance with the above legitimate penological interests. Indeed, as noted above, plaintiff was using the KIOSK at a time when such use was not allowed, and did not desist from doing so, even after having been ordered repeatedly by defendant to stop, becoming increasingly argumentative in the process. Plaintiff's free speech rights, therefore, were not violated here.

IV. Plaintiff's First Amendment Freedom of Religion Claim

To establish his right to freely exercise his religion under the First Amendment has been violated, plaintiff must show defendants "burdened the practice of his religion, by preventing him from engaging in

conduct mandated by his faith." Freeman v. Arpaio, 125 F.3d 732, 736 (9th Cir. 1997); Graham v. C.I.R., 822 F.2d 844, 850-51 (9th Cir. 1987) (government action burdens prisoner's practice of religion if he or she is prevented from engaging in conduct mandated by his or her faith). "In order to reach the level of a constitutional violation," furthermore, "the interference with one's practice of religion 'must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine." Freeman, 125 F.3d at 737 (quoting Graham, 822 F.2d at 851).

At the outset, however, plaintiff must establish the particular religious conduct or practice at issue is mandated by his faith. This involves two criteria. First, plaintiff must demonstrate that his "proffered belief" is "sincerely held." Malik v. Brown, 16 F.3d 330, 333 (9th Cir. 1994). As observed by the Ninth Circuit, the First Amendment does not extend to religions that "are obviously shams and absurdities and whose members are patently devoid of religious sincerity." Id. (citations and internal quotes omitted). Second, plaintiff must show that his religious exercise claim is "'rooted in religious belief, not in 'purely secular' philosophical concerns.'" Id. (quoting Wisconsin v. Yoder, 406 U.S. 205, 215-16 (1972)). As to this second criteria, determining whether plaintiff's claim is "rooted in religious belief" requires analyzing whether it is related to his "sincerely held religious belief." Id.

With respect to the above inquiry, the Supreme Court has noted that "[t]he determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task." Thomas v. Review Bd. of Indiana Employment Security Sec. Division, 450 U.S. 707, 714 (1981). Further, since "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection," the resolution of the above question should not "turn upon a judicial perception of the particular belief or practice in question." Id. That is, because "[i]nterfaith differences . . . are not uncommon among followers of a particular creed," and because "the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses," the guarantee of free exercise of religion "is not limited to beliefs which are shared by all of the members of a religious sect." Id. at 715-16. In other words, "[c]ourts are not arbiters of scriptural interpretation." Id. at 716.

Nevertheless, the undersigned finds plaintiff has failed to establish defendant prevented him from engaging in conduct mandated by his faith. In his amended complaint, plaintiff alleges defendant pushed him with his left arm, and that "this action was contrary to" his "religious mandates." But plaintiff does

REPORT AND RECOMMENDATION
Page - 9

not state what those religious mandates are, let alone the religion to which he adheres. Nor does plaintiff explain with any specificity exactly in what way or ways being pushed with defendant's left arm – even assuming this in fact is what occurred – burdened those mandates. As noted above, plaintiff must respond to plaintiff's motion by setting forth specific facts showing there is a genuine issue for trial, and may not merely rely on the unsubstantiated assertions in his amended complaint. His failure to do so here, as with his free speech claim, leaves his freedom of religion claim lacking validity.

Even if plaintiff could meet this threshold determination, he again has failed to show defendant's action was not reasonably related to a legitimate penological interest. The right to freely exercise one's religion, as with all First Amendment rights, "is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." O'Lone v. Shabazz, 482 U.S. 342, 348 (1987). To assist in deciding how to balance these competing interests, also as with those other rights, "[w]hen a prison regulation impinges on inmates' constitutional rights," the prison restriction "is valid if it is reasonably related to legitimate penological interests." Ward v. Walsh, 1 F.3d 873, 876 (9th Cir. 1993) (quoting Turner, 482 U.S. at 89).

As noted above in regard to asserted First Amendment rights, the following factors are considered in determining when a regulation is reasonably related to legitimate penological interests:

> First, there must be a "'valid, rational connection' between the prison [restriction] and the legitimate governmental interest put forward to justify it." Second, whether there are "alternative means of exercising the right that remain open to prison inmates" must be assessed. Third, "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally" must be determined. Fourth, "the absence of ready alternatives" to the [restriction] must be explored. The "existence of obvious, easy alternatives may be evidence that the [restriction] is not reasonable."

Id. (citations omitted); see also Overton v. Bazzetta, 539 U.S. 126, 132 (2003). However, in making the above determination, it must be noted that "substantial deference" is to be accorded "to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." Overton, 539 U.S. at 132. The burden of proof, furthermore, is not on defendants to establish the validity of the challenged restriction, but on plaintiff "to disprove it." Id.

Also as noted above, plaintiff alleges in his amended complaint that defendant pushed him with his left arm. In his declaration, defendant denies he ever came into physical contact with plaintiff. While

REPORT AND RECOMMENDATION
Page - 10

the investigation into plaintiff's grievance concerning this incident indicates the possibility that defendant "may have established contact with" him (Dkt. #31-4, Exhibit 3, Attachment C), no definitive evidence of this occurring has been presented to the Court. Nevertheless, assuming – though not specifically finding – that some physical contact did occur, plaintiff has not established defendant had no legitimate penological interest in stopping him from using the KIOSK as explained above.[5] Plaintiff, furthermore, has failed to show there is an absence of alternative means of exercising his religion,[6] the impact accommodation of that right would have on the prison or prison resources would not be severe,[7] or the absence of any ready alternatives to defendant's actions.[8]

V.     Plaintiff's Eighth Amendment Claim

The Eighth Amendment prohibits those "punishments which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society . . . or which involve the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 102-03 (1976) (citations omitted). To state a claim under the Eighth Amendment, plaintiff must satisfy two requirements. First, the deprivation being alleged "must be, objectively, 'sufficiently serious.'" Farmer v. Brennan, 511 U.S. 825, 834 (1994)

---

[5] The absence of such an interest could be shown, for example, where, unlike in this case, the logical connection between the prison restriction and "the legitimate governmental interest put forward to justify it" is "so remote as to render" the restriction "arbitrary or irrational." Turner, 482 U.S. at 89-90.

[6] "The relevant inquiry" is not whether an inmate had "an alternative means of engaging in the particular religious practice" claimed to have been affected, but whether he or she was "denied all means of religious expression." Ward, 1 F.3d at 877 (emphasis added) Thus, if an inmate retains "the ability to participate in other significant rituals and ceremonies of" his faith – as plaintiff has failed to show has not happened here – this is likely to be seen as evidence of the reasonableness of the challenged restriction, although "some aspects of religious practice" may have been "impinged upon." Id.; see also Turner, 482 U.S. at 90 ("Where 'other avenues' remain available for the exercise of the asserted right, courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.'") (citation omitted).

[7] In determining the reasonableness of the challenged action, courts should keep in mind that if accommodating "an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff," they "should be particularly deferential to the informed discretion of correctional officials." Turner, 482 U.S. at 90 ("In the necessarily closed environment of the correctional institution, few changes will have no ramifications . . . on the use of the prison's limited resources for preserving institutional order."). Indeed, if prison officials were unable to under any circumstances to make physical contact with inmates when necessary to get them to comply with valid directives to do or desist from doing something – as accommodation of plaintiff's asserted religious mandate would seem to imply – it is not difficult to see this having a huge adverse impact not only on prison staff, but on a prison's functioning in general.

[8] As noted above, "[t]his is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." Turner, 482 U.S. at 90-91. If, however, an inmate "can point to an alternative that fully accommodates" his or her "rights at de minimis cost to valid penological interests," this may be considered as evidence that the restriction "does not satisfy the reasonable relationship standard." Id. Plaintiff has not pointed to any such alternative in this case.

REPORT AND RECOMMENDATION
Page - 11

(citation omitted). That is, the prison official's "act or omission must result in the denial of 'the minimum civilized measure of life's necessities.'" Id. For claims based on failure to prevent harm, the inmate also must show he was "incarcerated under conditions posing a substantial risk of serious harm." Id.

In addition to this "objective component," there is a subjective one. Keenan v. Hall, 83 F.3d 1083, 1089 (9th Cir. 1996). The prison official thus also "must have a 'sufficiently culpable state of mind.'" Farmer, 511 U.S. at 834 (citation omitted); Helling v. McKinney, 509 U.S. 25, 33 (1993) ("[A] claim that a prisoner's confinement violate[s] the Eighth Amendment requires an inquiry into the prison officials' state of mind."). This state of mind "is one of 'deliberate indifference' to inmate health or safety." Farmer, 511 U.S. at 834. In other words, liability under the Eighth Amendment "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" Id. at 835 (citation omitted). An official, therefore, will not be liable:

> [U]nless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harms exists, and he must also draw the inference.

Id. at 837; see also Wallis v. Baldwin, 70 F.3d 1074, 1077 (9th Cir. 1995). A prison "official's failure to alleviate a significant risk that he should have perceived but did not," therefore, cannot "be condemned as the infliction of punishment." Id. at 838.

Plaintiff alleges in his amended complaint that "[d]efendant's actions" violated his right to be free from cruel and unusual punishment under the Eighth Amendment. (Dkt. #23). This allegation, however, as with his two First Amendment claims, is, as noted by defendant, also without merit. At most, plaintiff claims defendant pushed him with his left arm and threatened him with both "increased punishment" and placement in segregation. Plaintiff, though, has not shown the alleged pushing or verbal threat of being punished are objectively, sufficiently serious that they resulted either in the denial of the minimal civilized measure of life's necessities or the unnecessary and wanton infliction of pain. Nor has he demonstrated that defendant had "a 'sufficiently culpable state of mind,'" that is, that subjectively, he was deliberately indifferent to plaintiff's health or safety.

VI. Plaintiff's State Law Claims

As noted above, in addition to his federal claims, plaintiff also has asserted state constitutional and state tort law claims arising from defendant's alleged actions. Defendant argues that given that plaintiff's

REPORT AND RECOMMENDATION
Page - 12

federal claims are without merit, the Court should refrain from exercising supplemental jurisdiction over his state law claims. The undersigned agrees. Where there is "no independent basis" for jurisdiction over the federal claims being asserted, that is, where those claims are "absolutely devoid of merit or obviously frivolous," supplemental jurisdiction does not attach. Brady v. Brown, 51 F.3d 810, 816 (9th Cir. 1995) (citation omitted); Hunter v. United Van Lines, 746 F.2d 635, 649 (9th Cir. 1985) (jurisdiction over state-law claims entirely derivative of jurisdiction over federal claims).

To the extent the federal claims against defendant in plaintiff's amended complaint can be said to have any merit, furthermore, "[t]he decision to retain jurisdiction" over his state law claims, even when those federal claims over which the Court does have original jurisdiction are dismissed, is entirely within its discretion. Brady, 51 F.3d at 816; see also United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966) (supplemental jurisdiction is doctrine of discretion, not of plaintiff's right). In addition to the above-noted requirement that there be "a sufficiently substantial federal claim," in order for supplemental jurisdiction to apply, there also must be "a common nucleus of operative fact between the state and federal claims." Gilder, 936 F.2d at 421.

It is clear in this case that plaintiff's state and federal claims arise from the same incident involving defendant's alleged actions. However, in weighing whether to retain jurisdiction over plaintiff's state law claims against defendant, the Court also must weigh "factors such as economy, convenience, fairness, and comity." Brady, 51 F.3d at 816. Here, those factors weigh against retention of supplemental jurisdiction. First, dismissal of the state law claims is not inappropriate at this stage of the proceedings. Gibbs, 383 U.S. at 726 (if federal claims are dismissed before trial, even though not insubstantial in jurisdictional sense, state claims should be dismissed as well). Further, while the state law claims do not "substantially predominate" this matter (Id. at 726-27), it cannot be said those claims are "so closely tied to questions of federal policy that the argument for exercise" of supplemental jurisdiction here "is particularly strong" (Id. at 727). The undersigned thus declines to exercise such jurisdiction in this case.

VII. Defendant's Assertion of Qualified Immunity

Defendants argues he is entitled to a grant of qualified immunity from liability in this matter. State officials "performing discretionary functions [are protected] from liability for civil damages" under

the doctrine of qualified immunity, "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Somers v. Thurman, 109 F.3d 614, 617 (9th Cir. 1997). In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court "mandated a two-step sequence for resolving government officials' qualified immunity claims," describing those steps as follows:

> . . . First, a court must decide whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right. . . . Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. . . . Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.

Pearson v. Callahan, 129 S.Ct. 808, 815-16 (2009) (citing Saucier, 533 U.S. at 121, and Anderson v. Creighton, 483 U.S. 635, 640 (1987)); see also Conn v. Gabbert, 526 U.S. 286, 290 (1999) (court first must determine whether plaintiff has alleged deprivation of actual constitutional right; if not, issue of qualified immunity does not arise).

More recently, however, the Supreme Court has held that although the above two-step sequence "is often appropriate, it should no longer be regarded as mandatory." Pearson, 129. S.Ct. at 818. Instead, the courts should "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id. That analysis, though, still "is often beneficial," such as when it is "difficult to decide whether a right is clearly established without deciding precisely what the constitutional right happens to be." Id. (citation omitted).

"At the same time, . . . [t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Id. In addition, the "underlying principle" of the Supreme Court's decision in Saucier "of encouraging federal courts to decide unclear legal questions in order to clarify the law for the future 'is not meaningfully advanced . . . when the definition of constitutional rights depends on a federal court's uncertain assumptions about state law.'" Id. at 819 (citation omitted). "When qualified immunity is asserted at the pleading stage," furthermore, "the precise factual basis for the plaintiff's claim or claims may be hard to identify." Id.

In this case, the undersigned found it necessary to first determine precisely the constitutional right or rights plaintiff alleged defendants had violated. As discussed above, though, plaintiff failed to allege a

1 valid First or Eighth Amendment, or any other constitutional, claim against defendant. Because plaintiff
2 has not alleged an actual deprivation of his constitutional rights, the issue of qualified immunity does not
3 arise here, and the Court, therefore, need not determine whether defendants are entitled thereto. <u>Conn</u>, 526
4 U.S. at 293. Accordingly, the undersigned declines to do so.

## CONCLUSION

Defendant has met his burden of demonstrating that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law. Plaintiff has failed to allege facts sufficient to form a federal constitutional violation. In addition, supplemental jurisdiction over plaintiff's state law claims is not appropriate in this matter. The undersigned thus recommends that the Court GRANT defendant's motion for summary judgment. (Dkt. #31). The undersigned further recommends that plaintiff's amended complaint be dismissed with prejudice, and that all other motions currently pending before the Court be denied as well.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedures ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. <u>See also</u> Fed.R.Civ.P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **July 10, 2009**, as noted in the caption.

DATED this 17th day of June, 2009.

*/s/ Karen L. Strombom*
Karen L. Strombom
United States Magistrate Judge